The next case on the docket is In re Marriage of Weger, I guess it's pronounced. I'm sure I'll be told that by Mr. Ryan. Is it Weger? I understand, but the client's name is In re the Marriage of Weger? Weger. Okay. And you are Mr. Ryan. You may proceed when you're ready, Mr. Ryan. And this is the case of 515-0141, In re Marriage of Susan Weger v. Ricky Weger. Thank you. Good morning, Your Honor. May it please the Court, withdraw this case. There are three issues on appeal due to the time limitations. I mainly will address the first two, being the issue of the trial court's division and distribution of the retirement plans, the defined benefit plans of the parties, and the second issue is the maintenance issue. If you look at the record, and there was the post-trial motion, in resolving the post-trial motion, the Court basically concluded its disposition of this case by reference to the Simmons case in stating the Marriage and Dissolution of Marriage Act, whenever possible, seeks to cut off all entitlements between the parties so they may go their separate ways in life. And I would agree that perhaps the, that was cited without authority in Simmons, but I think the interpretation of that is we came out of the Marriage and Dissolution of Marriage Act, practicing a while, I think that was in 1980, and with that we did get definitions of marital and non-marital property. We got statutes with regard to child support and a formula for child support. We addressed the manner in which the Court should resolve property division, and we addressed the issues, or the Act addressed the issues of how the Court should approach maintenance. And with that, they were giving guidelines and rules for cutting off the entitlements of the parties and proceeding with their separate lives. It wasn't, as in the case here, each party keep what they've got or acquired, both marital and non-marital, no maintenance, but we are going to put in a child support provision. When you, and I will address the Simmons case more when I get into maintenance, but I would like to start with the defined benefit plans. And the facts apply to both issues, Your Honors, but the parties were married for 16 and a half years. At the time of the hearings, Mr. Weaver was 61 years of age, Mrs. Weaver was 45 years of age. There's a 26, or I guess a 16-year discrepancy in the parties, and they had one child age 14. When you look at Mr. Weaver's employment, pre-marital he had been employed at the company for which the plans were applicable for 294 months. That's 24 and a half years. They were married 16 and a half years. With that, if you do the computations, 60% of his employment life was pre-marital, 40% was marital. When you get into his retirement account, the court awarded him non-marital 31% of his retirement account and awarded 61% as being marital, a huge reversal. And when you get into the law, then, concerning the division of defined benefit plans, as I've set forth in my brief, there are three basic ways to go about evaluating and distributing these plans. One is to determine the present-day value of the plans. The second is what is called the reserved jurisdiction approach, particularly under the earlier years. And under the reserved jurisdiction approach, the court reserves and defers any division of the retirement plan until it comes into effect upon retirement. In other words, it's not making any determination today. It's completely deferring it to the future. At that point, we know what the distribution is going to be from... But that wasn't done here, right? Pardon me? That wasn't done here. That wasn't done. They didn't defer. Okay. And the third is sometimes called the reserved jurisdiction plan, to be confused with the former plan. It's also called the proportionality rule. And as Gitlin calls them, if I'm pronouncing that correct, it's the coverture formula. And under that one, you use the formula, the number of years of marriage invested in the plan. The denominator is the total number of years in the plan, usually times 50 percent, times the distribution when it gets into the future. That wasn't done here either, was it? Pardon me, Your Honor? That wasn't done here, right? That wasn't done either. Right. So we go back to the first one. So let's go back to the first one, and that's the present-day value, and that purports to be the manner in which the court divided this plan. And if you look, well, if you look at the case law that is cited to the court, and the case law comes out generally expert testimony is required to do a present-day value. I've yet to see the case where there wasn't present or expert testimony in establishing the present-day value. There's one out there. There is one. Okay. I missed that, Your Honor. I know. There is one. I've seen it. What we have, Your Honor, is then if you look at establishing the present-day value, you need to know the amount of money on the date of retirement backdated to the date that the court is hearing the case such that when you make the periodic payments, that number is — that account is down to zero on the estimated date of death. It gets into a lot of actuarial testimony. It gets into projections of interest rates. It gets into discounts. It gets into a number of different properties, all to come up with the present-day value of this plan. And I submit to the court there is no record upon which to utilize the present-day value of this plan. As set forth in Gitlin, these retirement, these defined benefit plans are required to put certain funding into the plan. Sort of like, well, we take Social Security and we invest it in the Social Security Administration for when people are going to retire under Social Security. Are you saying that your client, that the court abused its discretion because it didn't consider present-day value in these plans? Well, I mean, I'm not sure what you're — I'm not sure where you're going with that. To clarify, if I understand your question, Your Honor, the court says it's applying the present-day value to the plan, but there is no record by which the court can do that. But you're also saying that it's discretionary for them to choose which approach they take, correct? It is discretionary for them to take what approach they want, as long as that approach is reasonable, non-arbitrary, based upon the evidence. And the court can consider, in doing that, the percentage of non-marital property that's being assigned to the plan, correct, in making its overall assessment? If you were going to do that, yes, Your Honor. And I mean, in order to do that, as to further complicate the matter in getting the present-day value, you do have to determine how much of that present-day value is non-marital, how much is marital. Well, at least there was a determination of non-marital and marital for your client on his plans, correct? Yes, Your Honor. They said that out of the entire plan, 31% was premarital. Right. And the remainder, well, basically— 61% was marital. Yeah. Okay. And with that, Your Honor, if you look at Gitlin and the authorities, they say that the value of a plan on what I call the front end, the amount that is invested in the plan during the earlier years, is worth more than what is added at the end—the end point, the back end, because without those early years, you would not have the investment in there, and you get into these defined benefit plans, where they are basically based upon the number of years involved in the plan and some formula with regard to what is your final income on the date that there's going to be distribution. But in the formula procedure where you take the number of years of marriage over the number of total years in the plan, they don't take that into account, what you just described. That is that the value of the original money is greater than the value of the money put in later. It's just a numerical application of a formula, correct? It's a numerical application of a formula. You're right, Your Honor. And all of the authority that's cited under both briefs look at it as being the most recognized, the most used, the most common distribution. In fact, I don't know what's come before the court or your private practice, but I would say 98% of the time, that is the manner in which these plans are addressed due to the financial commitment the parties would have to make in getting the expert testimony involved. Right. It's the easiest way for the court, because you don't need an expert. You don't need to do all of what you're saying. And I submit to the court that we put in the necessary evidence, Mr. Weeger and I put in the necessary evidence to use that formula. When you look at trying to look at the present-day value, they took a figure that was nine months prior to the marriage that I would submit to the court is what the company had been putting in as far as Mr. Weeger's share into the plan on a monetary contribution, because they are required to make a monetary contribution, the same as Social Security and the same as the government plans. Including the judicial plans, but they're supposed to be a pool of money, which people aren't supposed to borrow against, and the government isn't. And with that, they just took a figure as that, and said that's the present-day value of the plan as of that date. And then Mr. Holmes sort of looked at the ceiling and says, and, Judge, I think 5% is a reasonable rate of interest. And so take that number, put it times 5%, and make that the percentage of the investment premarital in this plan. Okay. And that's the way we – Let me ask you a question about this 5%. Who testified about the 5% and how was this figure arrived at? There was no testimony whatsoever. I mean, what you basically had, Your Honor, we concluded the evidence, and then the court ordered the attorneys to file simultaneous briefs. There was no mention of 5% up until the time that the respondent – or, I'm sorry, the appellee submitted its simultaneous brief, which I think came in about a day after mine. And out of that, we just have, well, we suggest the court that 5% is a reasonable rate of interest. So this came in by way of argument after the close of the evidence. That's right. And without any foundation, any evidence of what should have – what was the rate of interest during that period of time, or what may have been the investments actually into the plan. Well, my next question is what was that 5% figure supposed to mean? Judge, I think what – well, if I recall correctly, as I said, they had a figure that was – well, they had a figure – I do have the figures here. If I can put my finger on them real quick. They had a figure that prior – on the date that the party – well, nine months prior to the parties getting married, the plan was worth $48,000. At the time of the hearing, it was – they had a figure that said it was around $150. And so they took the 48 – well, I'm not even – no, that wasn't the way it went. That wasn't the figures used. That was the final figures. They just took a figure that was the amount invested in the plan nine – up to nine months prior to marriage and 5% of that over the years and said that's what the plan's worth, non-merit. That all the rest is merit. And that's the argument. Without any authority, without any expert testimony, without any foundation at all, they just took a figure, looked at the sky, and I guess it said 5% is reasonable, and so there – here we are. And from that, out of, you know, a work history of 60% pre-marital and 40% – Well, another question. Yes, sir. Did you get an opportunity then to file any response or reply argument to that and present any counter-argument? I did. It was simultaneous briefs. I then filed a post-trial motion attacking all of this. And so I was able to bring that to the court, including the judge. There is no foundation. There's no expert testimony. Here's all the proofs there are. And with that, you know, the judge says, well, the purpose of the act is to disentangle the parties, and so this is a fair result, and carried it over into the maintenance argument. Okay. And I guess I haven't gotten to the maintenance argument. Well, you'll have a few minutes after Appley argues. Our basic argument is there is no record for the present-day value, and there is a record regarding the health insurer approach. Thank you, Your Honor. Thank you. As I said, you will have some rebuttal time. Okay. Mr. Drysdale, is that correct? Yes, ma'am. All right, Mr. Drysdale, whenever you're ready. Before you start, I hate to be rude, but where did the 5% come from? Certainly, and may it please the Court. I believe Mr. Holmes looked at, as Mr. Ryan suggested, the value of basically the several exhibits that have been presented on the value of the respondent's plans, and estimated based on the plethora of exhibits, there were over 50 exhibits here, specifically, I think we look at Plaintiffs' Exhibits 17 through 20, we see vested amounts, and then we look at the Plaintiffs' Exhibit 16, which showed the pre-marital value of the plan, and Mr. Holmes used that estimated value of 5% to come up with the reasonable return on this. Was that during a hearing, or was that in a brief? That was in, the Court had asked Mr. Holmes to submit, and Mr. Ryan, to submit this evidence prior to the trial, so it was in Mr. Holmes' post-trial submission to the Court. All right, well, you just said submit it prior to trial, and then you said it was in his post-trial brief. I'm sorry, Your Honor, following trial. It was in his argument as to allocation of the property. Okay, so the 5% arose as a result of argument, but it was based on exhibits. It was supported by the exhibits, Your Honor. Well, I guess what I'm asking is, the lawyer made a conclusion based on the exhibits, but nothing was admitted into the record at trial. Is that fair? It is fair. It is of as much, there was nothing admitted into the record at trial conclusively establishing 5%, if that's Your Honor's question. Yes, thank you very much. You're welcome. I'm sorry to have interrupted. That's fine. I would like to jump back, though, and discuss the fact that it's the Respondent's contention in this case that there are only three permissible methods here to divide retirement accounts, despite the fact that all of the case law overwhelmingly supports the fact that it is within the trial judge's discretion. And, in fact, as Your Honor has pointed out, the trial judge has discretion to choose a method of pension and retirement benefit apportionment. And that's what the trial judge did in this case. And the case law is very clear. Even the case law that discusses in-ray marriage of Hunt, where these formulas were first laid out, for example, in-ray marriage of Betts, described the Hunt method extensively, and then went on to say that, quote, that does not mean that any other admittedly sound approach must be rejected in all the circumstances. The Hunt method was not used here, was it? It was not, Your Honor. Okay. What the trial judge did in this case is the trial judge looked at the guiding principle in property distribution. And the guiding principle in fashioning property dispositions in a marital case is equity. What is fair and just to the parties? It doesn't have to be equal. It has to be equitable. And the trial judge looked at the value of all of the 401K and retirement plans that each of the parties were walking away with here. Plaintiff's Exhibit 15 specifically said that Respondent's 401K plan had an actual value of $658,000 as of September 5th, 2014. He had a retirement account of $157,000. So he is getting $816,000 in retirement benefits. The trial judge said, you keep that. And then the trial judge looked at what Susan was getting in this case. And she had a thrift plan worth $348,000, and she had a retirement account valued at $45,000, and a legacy plan valued at $138,000. So Susan walked away with approximately $532,000, $283,000 less in retirement benefits than what Ricky walked away with. The trial judge said, because you both have substantial retirement accounts, we're going to avoid the entanglement here. And Ricky, you keep your retirement account. Susan, you keep your substantial retirement account. Ricky got more by way of retirement accounts this way. He got to keep the entire value of his 401K and his pension. And to say that this isn't an equitable distribution of the party's retirement accounts is simply to ignore the values of these accounts and to ignore the facts in this case. And we know specifically one of the cases relied heavily on that respondent in their brief, and that's the Wisniewski case. And in that case, the husband had two pensions funded for 44 years, and the wife had no pensions whatsoever. And that's enough to make this case different, but the court discussed the hunt methods, the cash-out methods, the coverture formula. All of that was discussed in the Wisniewski case. And then the court went on to say, and I'm quoting from the case, the trial court had discretion to consider the evidence before it and devise a method of its own. And that's what the trial court did here. It considered all the evidence. It heard all of the arguments regarding use this formula, use that formula, do this, do that. And what the trial judge did is he looked and he said, Ricky has a lot more money than Susan. Susan's going to be working a lot longer than Ricky, so she's probably going to make that up. Let's let them walk away. Now, what the respondent would like this court to do is send this back down so we can tangle this up more, we can make this more complicated than it needs to be, specifically possibly by entering a quill drill or whatever else the respondent would like to get done here. But the fact of the matter is this is an equitable distribution. When would Ricky have been eligible for Social Security? Judge, I believe that – I don't know that off the top of my head. Mr. Weider's age was 61 at the time of the divorce, and so I don't know for sure when he would have been eligible. But, again, the fact of the matter is, is at the time of the divorce, there was the age difference, but Ricky's retirement benefits were substantially higher than Susan's, and that's in the record. Plaintiff's Exhibit – Plaintiff's Exhibit, I believe, 14, 15 shows how much Ricky had. And so the trial judge said, we're just going to let everyone walk away with what they've accrued here and avoid – and that's where the entanglement comes in, the unnecessary entanglement. It's not that the distribution was not equitable. It's simply we're going to give everyone their large retirement accounts and we're not going to entangle ourselves. Doesn't the court still have to make specific findings to determine marital and non-marital before it can determine the equities? I believe that the court does, Your Honor, but the court made those findings. Plaintiff's Exhibit 15, the respondent's 401k plan had the value, and then the record goes on to state that $499,000 of that was declared marital. But as Justice Cates pointed out, the court, when making that final property distribution, can consider, okay, what marital property are you getting and what non-marital property are you getting? So he combined those two numbers and said Ricky has a 401k value shown by Plaintiff's Exhibit 15 of $658,000, some marital, some non-marital, but that's what he's walking away with. Was there any real dispute over what was marital and non-marital in this case? I don't believe so, Your Honor, no. And so, and the trial judge did that regarding other pieces of information here. I'm not going to spend a lot of time on the Hershey stock and the credit union account that was raised in the briefs, but there's ample evidence to support that Ricky removed $9,500 from a Hershey stock account that he kept, and he also cashed out $17,000 of a stock that he says, well, I gave $5,000 of that to Susan. And Susan says, no, you didn't. And the trial judge believes Susan made a credibility determination and charged that against Ricky. There's ample evidence in the record to support that as well. Can you talk to me about the complaint that Ricky has for $15 a week in child support? The child support, I certainly can, Your Honor. That speaks to the third issue. Am I right? It's $15. I believe that is correct. We are arguing over $15. The court entered an order at the hearing on temporary matters that said Ricky should pay $208 a week in child support. 20% of the respondent's net income as established from the actual numbers on his pay stub. That's at the record at 571. Counsel for the respondent at that hearing admittedly was different than counsel from the respondent at the final hearing, stated that the $208 a week figure, it is what it is on the paycheck, and we really don't have a dispute over the math. Same judge presided over the final hearing. Susan's counsel submitted an extremely detailed child support calculation contained in the record at 345 that yielded $208 a week. The respondent submitted $183 per week. The trial judge rejected the respondent's calculation. Part of this was probably because the respondent's calculation stated the wrong projected year-end gross income. It stated $74,567 when it should have stated $76,000 based on Ricky's pay stubs that were submitted to the trial judge. And then the respondent goes on to make the argument in his reply brief that the child support calculation should have been reduced by the 401k deduction being allowed and included in the calculation of Ricky's net income. Now, this argument is simply wrong because the respondent's 401k contributions are voluntary, and therefore they're not allowed as a deduction pursuant to 750 ILCS 5 slash 505A3D. And then when we look to 505A3, it says that the child support is to be determined from all income from all sources. And respondent's 2013 federal income tax that was submitted to the court shows a capital gain that wasn't considered in the original calculation. And then when we look to the record to respondent or to Susan's calculation using that capital gain, his actual child support should be $254 a week, not $208. So it actually seems that he received a windfall here by only paying $208 a week, a windfall that Susan's not challenging. But the respondent then went on to hear him admit that since the original child support calculation was entered, his income had increased by $8,000 a year. That's at the record at page 1024. So he's paying less than he should, and his income has went up, but yet we should decrease his child support by $15. That just simply doesn't hold weight. There was ample evidence in the record to support the trial judge accepted the petitioner's correct calculation of child support, and there's ample evidence to support that it was an abuse of discretion. And I'd briefly like to touch on the maintenance issue. The respondent intends that there was an abuse of discretion when the trial court held that Ricky failed to show he was entitled to maintenance. But in Ray Marriage and Martin, a Fourth District case, says an award of maintenance is warranted when the court finds that the spouse seeking maintenance lacks sufficient property, including marital property, to provide for his reasonable needs and is unable to support himself. So we have to look at what Ricky's getting here, marital and non-marital property. And to look at that, we look at the record at page 444 through 455. Ricky's getting all of his retirement accounts valued together at $816,172. He has non-marital real estate of 5 and 4.26 acres and a remainder interest in 38.5 acres of land. Respondent was awarded two boats, a camper, an Ameritrade account valued at $4,500, a county investor's account valued at $14,000, one half of the party's timeshare valued at $3,500, two cars, a utility trailer, a tractor valued at $17,000, and a four-wheeler valued at $3,000, among other things. To say that Mr. Weger is going without care and needs maintenance based on everything that he was awarded, on top of the fact that the evidence supports that he's making $76,000 a year, and to turn around and say that denying maintenance under those facts is an abuse of discretion is just simply not supported by the record. And then the respondent's final argument on maintenance is that they use a quote from a couple cases that say, the benchmark for determining the amount of maintenance is the recipient's reasonable needs in light of the standard of living established during the marriage. But this goes to the amount of maintenance. We're putting the cart before the horse here. We never get to the amount of maintenance if we look at the property that Ricky has and determine that he's not entitled to maintenance to begin with. And that is supported by the statute, 750-ILCS-504A, expressly stating the court shall first determine whether maintenance is appropriate. The court did that here. It said maintenance is inappropriate and never got in to the amount. And for all these reasons, we respectfully request that this court affirm the trial court's judgment as to maintenance, property distribution, and child support. Thank you. I just have a question for you. Yes, ma'am. I want to make sure my notes are correct. Your client submitted a document showing that his child support should be $208 a week, but that was early on in the litigation? It was at the hearing on temporary matters, but it was resubmitted during the final hearing, Your Honor. So she did not vary from her paperwork in the temporary proceeding, and yet she could have amended it to show a capital gain that had not been considered? She could have amended it, Your Honor, to show that Ricky Weger actually should be paying $254 a week in child support, but chose to leave the child support where it was at $208 a week. All right. And it's your position $183 is at least his argument is that he's making a 401k deduction? That is at least part of the respondent's argument that his net income should have been reduced by the 401k deduction, which is simply impermissible pursuant to statute. Okay. Thank you very much. Thank you. Mr. Ryan, do you have some rebuttal? I do, Your Honor. Thank you. Okay. Attorney 2, the maintenance issue, and we had the tax returns of the parties the last four years prior to the hearing, plus the income of the parties was projected from their pay stubs for the year of the hearing. And if you look at that exhibit and there's a respondent, the monstee, the A number one that's contained within the record, Mrs. Weger made practically twice as much as Mr. Weger. For 2010, the difference was $58,000 for him, $110,000 for her. 2011, $58,000 for him, $113,000 for her. The following year, $60,000 to $117,000 for her. What we had was practically twice as much as Mrs. Weger was making. With that, Your Honor, and then if you look and do the computations and it does get to the end, I hate arguing over $15 of child support. In fact, if you look at my statements of the post-trial motion, I said, you know, that is not a major concern except for when you take his gross income, you take after taxes, he's down to $48,500 a year. And with that, he is paying $10,815 a year out of that for child support, which has him on a cash flow of $37,700 a year. You look at Mrs. Weger and, you know, she's making, well, over the last year, $134,000. I didn't get my calculations up here as to what her net would be. Who has custody of the child? Mrs. Weger does, Your Honor. And you may look, it's not part of the appeal, but the record is right, including the person that did the custody evaluation, that she had just completely poisoned the child against the father where the child wouldn't talk to the father anymore. And it was her actions that did that. She has custody of the child. Are you saying that's in the record and it's somehow relevant? Well, when you ask for custody, that's why she ended up in custody. When you finally looked and said there's no way, if the court looks and says what she's done, we're awarding custody to him that the child was poisoned. I'm just wondering who's supporting the child on a day-to-day basis, that's all. If I could turn to the more germane issue, Your Honor, well, you know, if we're sitting there and he's paying $10,000 in child support, that takes him down to $37,700 a year in cash flow, to meet the standard of living that a party's had during the course of a marriage. With that, if you put, well, she's paying 20% of her income in child support, so she must be paying $20,000. I don't think she's there spending $30,000 in child support on this child. But if so, then it's approaching just the child has a lifestyle comparable to the father, and the wife has all this money left over. And then the record goes on to there was the trips where she took him to New York. Putting all of that aside, you do agree that your client received $283,000 more just from the, we're talking about the plans now, that would have allowed him to invest however he desired. Is that true? I don't agree with that, Your Honor, based upon their computations, number one. And number two, that he would be able to invest it. It's already sitting there in investment. And part of what they identified was a 401k plan, which doesn't get into the defined benefit plans. Okay. That was a misstatement by myself. But how much do you believe your client got out of this? What's the differential? You said it's on $283,000. What is it? Your Honor, I didn't approach it that way because I had the pension plans going by the coverture distribution, not knowing what they were really worth. So I divided that according to the coverture. And then I didn't anticipate that question. I don't have my closing argument in front of me. But frankly, when the smoke cleared, if you divided both of their – and she has the same thing. She has a defined benefit plan that, again, if you look at the front end and the back end, the majority of the investment is during the course of the marriage. Now they're getting the divorce. But with that, when you got to the end, and they've cited what all he got. When you got to it, he got less than the court, less than the marital property. But my recollection is, under my brief, that it really adds down there that he also then had a portion of her defined contribution plan. And frankly, it would have been to equalize the division between the partners. But there is a lifestyle. And he's now down to $37,000. And she's up there quite a bit, Your Honor. I get it. Okay. Thank you so much, Mr. Ryan. All right. This matter will be taken under advisement and a disposition will be issued in due course.